STEPHENS, Judge.
*578 Defendant Afis Arte Holt was convicted in Johnston County Superior Court on one count of robbery with a dangerous weapon and one count of felony conspiracy to commit first-degree burglary. Defendant appeals from the trial court's denial of his motion to dismiss the charge of robbery with a dangerous weapon. After diligent deliberation, we conclude that the trial court did not err in denying Defendant's motion to dismiss.
*543 I. Facts and Procedural History
It was just before ten o'clock on the night of 4 April 2013 when the residents of 83 Hearth Lane in Smithfield heard a knock at their front door. Larry Dowd was in the master bedroom preparing for bed while his granddaughter, Jayahna Cook, age 14, watched television in the living room. Mr. Dowd's daughter Madina, age 15, was preparing to take a shower in the family bathroom down the hall, and his son Rahim, age 19, was in his own bedroom with the door closed.
When she heard someone knocking at the front door, Jayahna got up to answer it, saw Defendant and two other men wearing hooded sweatshirts and masks to cover their faces, screamed "[h]e got a gun. He got a gun," and then ran to hide in the private bathroom that adjoins Mr. Dowd's master bedroom. Two of the men followed her, one of whom kicked down the bathroom door while the other demanded money from Mr. Dowd. When Mr. Dowd said he could not remember where he put his wallet, the men took him and Jayahna down the hallway to the family bathroom, the door to which had also been kicked down. There, they were held at gunpoint by a third man who told them to stand in the bathtub next to Madina, who had overheard the commotion and, unbeknownst to the intruders, already called 911 on her cell phone. Shortly thereafter, one of the men brought Rahim into the bathroom as well.
After a few minutes passed, Mr. Dowd told the men that he remembered where he had put his wallet and was taken back to his bedroom to retrieve it from a drawer. Upon discovering that the wallet contained $145.00, a bank card, and the family's social security cards, one of the men told Mr. Dowd, "I know you've got more. Give me whatever else you have," and then struck Mr. Dowd in his face and side, resulting in minor injuries. The men then returned Mr. Dowd to the hallway bathroom where the children were still being held at gunpoint. Moments later, the men took Madina to look for more money in the living room, where they forced her down to her knees and held a gun to the back of her head.
*579 Around that time, Officer Ashley McLamb of the Wilson Mills Police Department arrived at the residence in response to Madina's 911 call. Upon his arrival, Officer McLamb looked inside through a window in the front door, saw a silhouette in the living room, smelled a strong odor of marijuana, and heard a thumping noise, followed by a voice asking, "Where is it?" Officer McLamb started to call for backup, then saw Madina open the front door and run outside, followed by a man wearing a hooded sweatshirt and a mask over his face holding what appeared to be a sledgehammer. Officer McLamb pushed Madina to safety and drew his sidearm, but before he could engage the man, he heard the sound of breaking glass and saw two other men jump from one of the home's front windows and land in the bushes below. After confirming with Mr. Dowd that there were no other intruders inside, Officer McLamb tried to chase one of the men but was knocked unconscious by a blow to the side of his head from an unknown object.
In the next few minutes, several more local law enforcement officers arrived on the scene. After tending to Officer McLamb's wounds, they interviewed Mr. Dowd and his family and searched their neighborhood subdivision for suspects and evidence. Defendant was apprehended and arrested approximately one hour later in a neighboring yard while attempting to flee the scene. Around the same time, officers nearby apprehended and arrested Daccarus Stanton and Jesse Price. All three men were unarmed.
On 20 May 2013, Defendant was indicted by a Johnston County grand jury on one count of first-degree burglary, one count of felony conspiracy to commit first-degree burglary, two counts of robbery with a dangerous weapon, four counts of first-degree kidnapping, and one count of assault on a law enforcement officer inflicting serious injury. Defendant's trial began in Johnston County Superior Court on 17 March 2014.
During the trial, each of the residents of 83 Hearth Lane testified that Defendant and his co-conspirators had been armed with guns, although their testimony varied as to how many weapons they each said they saw. Madina *544 identified Defendant as the man who had held her family at gunpoint in the bathroom while the other two men searched the home. She testified that two of the men had handguns while the third man had a knife at one point but later picked up a small sledgehammer. Rahim testified that before he was taken into the family bathroom, one of the men entered his bedroom holding a small black handgun and forced him to sit or lie on his bed. On cross-examination, Rahim clarified that this was the only weapon he saw during the robbery. Jayahna testified that she *580 started screaming after she answered the knock at the front door and saw "a guy standing there with a gun pointing at [her]." Jayahna testified further that she was led at gunpoint from the master bathroom to the family bathroom, where she was also held at gunpoint, and that in total, two of the three men were armed with handguns. Mr. Dowd testified that after Jayahna screamed and hid in the master bathroom, two men came into his bedroom and both were armed with handguns, one of which had "a five- to six-inch barrel" and "was a handgun that you hold in your hand, and it looked like it may have had a clip." Mr. Dowd testified further that after being taken to the family bathroom, a third man held him-along with Madina, Rahim, and Jayahna-there at gunpoint. On cross-examination, when Defendant's counsel sought to impeach Mr. Dowd's testimony by noting that he had previously told prosecutors that only the two men who came into his bedroom were armed with handguns, Mr. Dowd responded that, "Well, I'm sure I told [the prosecutor] about when we was taken into the other bathroom and how the person there also had a handgun. Now, if I left that out, it wasn't intentional." In a similar vein, when Defendant's counsel confronted Mr. Dowd with the fact that his initial statement to investigators at the scene shortly after the robbery only mentioned that one of the men had had a gun, Mr. Dowd stood by his testimony and explained that:
I distinctly remember all three of them having handguns. I didn't mention it in this report. I don't know why. I was really dazed and everything. I would have no reason not to mention it if it came to my mind, but I don't know why it's just one handgun mentioned in the report when I know [there were] at least three.
After presenting testimony from each of the victims, the State also introduced into evidence two items that were recovered from the scene on the night of the robbery. The first item was identified by Johnston County Sheriff's Deputy Ronald Mazur as an unloaded Black Ops BB Pistol that investigators found in the bushes directly beneath the window where Officer McLamb saw two men jump after he first approached the residence. The second item was a pellet gun with a broken barrel and broken slide mechanism found lying in a neighboring yard approximately 400 to 475 feet away from the residence next to an abandoned black Nike shoe that investigators suspected came from one of the suspects. No evidence was introduced regarding fingerprints on, or ownership of, either gun, nor was any evidence offered as to operability, and neither the victims nor Defendant or his accomplices identified either gun as having been used during the robbery.
*581 Although Defendant did not testify at trial, the State introduced into evidence two post-arrest statements that he gave to Detective Jamey Snipes of the Johnston County Sheriff's Office. Detective Snipes testified that on the night of the crime, after being informed of and orally waiving his Miranda rights, Defendant told him that he had come along to 83 Hearth Lane with two other men because he had heard there were drugs and money in the house; that it was Defendant's job to serve as a lookout for the other two men; that Defendant spent most of the time trying to calm down the family in the bathroom; that Defendant was not armed with a gun during the robbery; that Defendant jumped out the front window after he realized the police had arrived; and that Defendant volunteered to "take the rap for everything" and would not name either of his two co-conspirators. Detective Snipes testified further that on 14 June 2013, after being informed of and waiving his Fifth and Sixth Amendment rights, Defendant gave him a second statement and explained that the girlfriend of one of the other men drove them to 83 Hearth Lane but did not know they *545 planned on robbing anyone; that after knocking on the front door, the men were invited inside and negotiated a deal to purchase one ounce of marijuana; that one of the residents produced a bag of marijuana and Defendant snatched it away and told him to either "take a loss or get it back with muscles"; that Defendant was unarmed and did not recall the other two men bringing their own guns to the residence, but believed it was possible they might have done so, although he also stated that if any guns were involved, they came from inside the home; and that after the police arrived, Defendant jumped out the front window and then ran, hid, and "dumped" the ounce of marijuana in the woods nearby as he ran to avoid getting caught with drugs.
At the close of the State's evidence, Defendant's counsel moved to dismiss all the charges against him except for the burglary and conspiracy charges. The trial court granted Defendant's motion to dismiss the assault on a law enforcement officer charge, as well as two of the four first-degree kidnapping charges, and also stated that it would instruct the jury on second-degree kidnapping on the two remaining charges. As for the two charges of robbery with a dangerous weapon, Defendant argued that they should be dismissed because the State failed to produce any evidence that the BB pistol and the pellet gun found near the scene of the robbery were operable or capable of inflicting serious bodily injury or death. The trial court ultimately denied Defendant's motion to dismiss the robbery with a dangerous weapon charges, but did agree to provide an additional instruction for the jury on the lesser-included offense of common law robbery. Defendant declined to put on evidence but renewed his motions to dismiss the remaining charges, which the *582 trial court denied. The case was submitted to the jury on 20 March 2014. That same day, the jury returned its verdict convicting Defendant on one count of robbery with a dangerous weapon and one count of conspiracy to commit first-degree burglary. The trial court sentenced Defendant to a term of 59 to 83 months imprisonment. On 25 March 2014, Defendant gave written notice of appeal to this Court.
II. Analysis
In his sole argument on appeal, Defendant contends that the trial court erred in denying his motion to dismiss the charge of robbery with a dangerous weapon. We disagree.
As this Court's prior decisions make clear, "[w]hen ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense." State v. Smith, 186 N.C.App. 57, 62, 650 S.E.2d 29, 33 (2007) (citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Cummings, 46 N.C.App. 680, 683, 265 S.E.2d 923, 925 (citation omitted), affirmed, 301 N.C. 374, 271 S.E.2d 277 (1980). "All evidence admitted, whether competent or incompetent, must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence and resolving in its favor any contradictions in the evidence." State v. Worsley, 336 N.C. 268, 274, 443 S.E.2d 68, 70-71 (1994) (citation omitted). Thus, a defendant's motion to dismiss "is properly denied if the evidence, when viewed in the above light, is such that a rational trier of fact could find beyond a reasonable doubt the existence of each element of the crime charged." Id. at 274, 443 S.E.2d at 71 (citation omitted). This Court reviews the trial court's denial of a motion to dismiss de novo. Smith, 186 N.C.App. at 62, 650 S.E.2d at 33.
Our Supreme Court has explained that the offense of robbery with a dangerous weapon, as defined under section 14-87 of our General Statutes, "consists of the following essential elements: (1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened." State v. Faison, 330 N.C. 347, 358, 411 S.E.2d 143, 149 (1991) (citation omitted); see also N.C. Gen.Stat. § 14-87(a) (2013). Our case law makes clear that for purposes of *546 section 14-87, a dangerous weapon is defined in the same way as a deadly weapon, which "is *583 generally defined as any article, instrument or substance which is likely to produce death or great bodily harm." State v. Sturdivant, 304 N.C. 293, 301, 283 S.E.2d 719, 725 (1981) ; see also State v. Smallwood, 78 N.C.App. 365, 368, 337 S.E.2d 143, 144 (1985) ("We note that Sturdivant, ... involved the definition of 'deadly' as opposed to 'dangerous,' and analyzed 'deadly' in terms of potential for producing death or great bodily harm. We perceive no functional difference in the terms, however. [Under section 14-87 ], the 'dangerous' weapon or means must be one which endangers or threatens life.") (citations omitted).
In the present case, Defendant argues that the trial court erred in denying his motion to dismiss because the State did not produce any evidence that the BB pistol and pellet gun found at the scene of the robbery were dangerous weapons capable of inflicting serious injury or death. In support of this argument, Defendant relies on our Supreme Court's observation in State v. Allen, 317 N.C. 119, 343 S.E.2d 893 (1986), that as a general matter, "[i]noperative firearms, and cap, or toy, pistols are not dangerous weapons within the meaning of [ section 14-87 ] because they cannot endanger or threaten life when used as firearms." Id. at 122, 343 S.E.2d at 895. While acknowledging that North Carolina's appellate courts have consistently found that BB pistols and pellet guns can be considered dangerous weapons when used in ways that do endanger human life, Defendant argues that the outcome here should be controlled by this Court's prior decision in State v. Fleming, 148 N.C.App. 16, 557 S.E.2d 560 (2001), where we held that the trial court erred in denying the defendant's motion to dismiss the charge of robbery with a dangerous weapon when the evidence showed that he committed two robberies using a BB gun and the State failed to introduce any evidence that the BB gun was capable of inflicting death or great bodily injury. Id. at 26, 557 S.E.2d at 566. Thus, Defendant argues that here, the uncontroverted evidence in the record is sufficient to support only a charge of common law robbery.
This argument is unavailing because it misconstrues both the evidence in the record and the rules our Supreme Court has established "to resolve sufficiency of evidence questions in armed robbery cases where the instrument used appears to be, but may not in fact be a dangerous weapon capable of endangering or threatening life." State v. Summey, 109 N.C.App. 518, 528, 428 S.E.2d 245, 251 (1993). Under the framework our Supreme Court set up in Allen, the rules are as follows:
(1) When a robbery is committed with what appeared to the victim to be a firearm or other dangerous weapon capable of endangering or threatening the life of the victim *584 and there is no evidence to the contrary, there is a mandatory presumption that the weapon was as it appeared to the victim to be. (2) If there is some evidence that the implement used was not a firearm or other dangerous weapon which could have threatened or endangered the life of the victim, the mandatory presumption disappears leaving only a permissive inference, which permits but does not require the jury to infer that the instrument used was in fact a firearm or other dangerous weapon whereby the victim's life was endangered or threatened. (3) If all the evidence shows the instrument could not have been a firearm or other dangerous weapon capable of threatening or endangering the life of the victim, the armed robbery charge should not be submitted to the jury.
317 N.C. at 124-25, 343 S.E.2d at 897. In summarizing its holding, and the implications of the third category of the test it established, the Allen Court reiterated that "if other evidence shows conclusively that the weapon was not what it appeared to be, then the jury should not be permitted to find that it was what it appeared to be," and the trial court should only instruct the jury on the lesser-included offense of common law robbery. Id. at 125, 343 S.E.2d at 897.
This Court's subsequent decision in Fleming provides a useful illustration of the Allen test's third category. There, the defendant committed two successive robberies by *547 brandishing what appeared to be a gun in his waistband; when he was apprehended moments later by police after the victims called 911 and described his vehicle, the defendant was carrying the exact amount of money stolen during the robberies, and the weapon, which was still in his waistband, turned out to be a BB gun. 148 N.C.App. at 18-19, 557 S.E.2d at 561-62. Thus, we held that, "[e]ven giving the State all reasonable inferences which may be drawn from the above-recited facts, it is clear [that] the weapon in question was, in fact, a BB gun," id. at 21-22, 557 S.E.2d at 564, and we ultimately concluded that "when a weapon such as a BB gun is determined to be the weapon used in a particular case, the record must contain evidence to support the jury's finding that the instrument was a dangerous weapon." Id. at 26, 557 S.E.2d at 566. Therefore, because there was no evidence that the weapon used to perpetrate the robberies was dangerous, we remanded the case for resentencing on the lesser-included offense of common law robbery. Id.
Defendant insists that here, as in Fleming, absent any showing by the State that the BB pistol and pellet gun found near the victims'
*585 residence were capable of inflicting death or serious injury, the evidence falls within the Allen test's third category. However, this argument ignores important distinctions between the facts at issue here and those in Fleming. Most notably, unlike in Fleming, where the weapon used to perpetrate the robbery was recovered from the defendant's direct physical possession, here there is no evidence that conclusively links either the BB pistol or the pellet gun to the robbery. Neither Defendant nor his co-conspirators were carrying any weapons when they were apprehended by police. Further, no evidence was offered regarding any fingerprints on, or ownership of, either gun, and neither the victims nor Defendant identified either of the guns as having been used during the robbery. Moreover, even assuming arguendo that both the BB pistol and the pellet gun could be conclusively linked to the robbery, Mr. Dowd testified that all three of the men who robbed his home were armed with handguns. Although Defendant's counsel attempted to impeach Mr. Dowd on this point, the trial court properly left the credibility of Mr. Dowd's testimony as a matter for the jury to resolve, and as such, it would have been permissible for a reasonable juror to infer that not all, if any, of the weapons used during the robbery had been recovered or accounted for. Indeed, if taken as true, Defendant's second post-arrest statement to Detective Snipes suggests that Defendant had the motivation and opportunity to "dump" the third weapon just like he claimed to have dumped the ounce of marijuana he purported to have stolen from the residence that investigators never recovered.
In light of the preceding analysis, we conclude that while there is "some evidence that the implement[s] used [were] not ... firearm[s] or other dangerous weapon[s] which could have threatened or endangered the [lives] of the victim[s]," when considered collectively, the evidence does not conclusively demonstrate that each of the instruments used during the robbery "could not have been a firearm or other dangerous weapon." Allen, 317 N.C. at 124-25, 343 S.E.2d at 897 (emphasis added). We therefore conclude further that, despite Defendant's protestations to the contrary, this case falls within the Allen test's second category, which means that although the mandatory presumption of dangerousness attached to the Allen test's first category disappears, there remains a permissive inference for the jury's determination as to whether the weapons used during the robbery were, in fact, dangerous. Accordingly, we hold that the trial court did not err in denying Defendant's motion to dismiss.
NO ERROR.
Judges STEELMAN and McCULLOUGH concur.